UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

BILLY JOSEPH ALLEN BURRELL, )
)
        Plaintiff, )
)
v. )    No. 1:15CV190 RLW
)
NANCY BERRYHILL,[1] )
Acting Commissioner of Social Security, )
)
        Defendant. )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of

Defendant's final decision denying Plaintiff's applications for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act and for Supplemental Security Income ("SSI")

under Title XVI of the Act. For the reasons set forth below, the Court affirms the decision of the

Commissioner.

## I. Procedural History

On January 15, 2013, Plaintiff protectively filed applications for DIB and SSI, alleging

disability beginning January 15, 2013. (Tr. 11, 130-44) Plaintiff alleged that he became unable

to work due to scoliosis, hernias, left torn rotator cuff, depression, and problems in both hands.

(Tr. 56, 78, 196) The applications were denied, and Plaintiff filed a request for a hearing before

an Administrative Law Judge ("ALJ"). (Tr. 77-82, 85-86) On April 3, 2014, Plaintiff testified at

a video hearing before the ALJ. (Tr. 24-55) On May 15, 2014, the ALJ determined that Plaintiff

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further actions needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

had not been under a disability from January 21, 2013[2], through the date of the decision. (Tr. 11-19) Plaintiff then filed a request for review, and on September 14, 2015, the Appeals Council denied Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the April 3, 2014 video hearing, Plaintiff was represented by counsel. After presenting an opening statement, counsel questioned Plaintiff. Plaintiff testified that he was 41 years old and lived with his cousin. Plaintiff was not married, but he had three children. Two of the children resided with their mother, and Plaintiff had custody of his seven-year-old daughter. Plaintiff received food stamps and other assistance, including Medicaid. He stated that he completed the 11th grade and did not obtain a GED. Plaintiff smoked two packs of cigarettes a day. He did not drink alcohol or use illegal drugs. Plaintiff testified that he measured five feet eight inches and weighed 124 pounds. (Tr. 26-33)

Plaintiff last worked for Bootheel Diesel, rebuilding injector pumps. He worked there for seven or eight months. Plaintiff testified that he was unable to do the work, and when he informed his employer that he needed surgery for his hands and elbows, Plaintiff was told not to come in. Plaintiff last worked in January, 2013. He had always worked as a mechanic, beginning in 1992 with John Deere, during which time he received mechanic training. (Tr. 33-35)

Plaintiff further stated that his father passed away in 1998, and that he experienced depression that worsened over time. Plaintiff received psychiatric treatment and medication. Plaintiff also was diagnosed with scoliosis, which prevented him from standing for long periods.

---

[2] At the hearing, Plaintiff amended his alleged disability onset date to January 21, 2013. (Tr. 11)

2

In 2008, Plaintiff's mother told Plaintiff she was done with him. Plaintiff was hospitalized and received mental health treatment after. However, he was able to return to work, earning over $20,000 a year for the past 20 years. After his 2008 mental health treatment, Plaintiff stopped taking his medication and going to therapy. A year ago, Plaintiff was prescribed Seroquel. He intentionally took too much of the medication and was involuntarily hospitalized. (Tr. 35-37)

Plaintiff further testified regarding his physical impairments. Plaintiff stated that his right hand swelled, requiring surgery in December 2013. However, Plaintiff's condition worsened. He could not touch is fingers or thumb because of a nerve running from his hand to his elbow. Plaintiff could hardly squeeze his right hand. In addition, Plaintiff's scoliosis caused back pain. He took Oxycodone three times a day for back and arm pain. If Plaintiff did not take his medication, he hurt all the time. Plaintiff also underwent an operation for hernias in 2010 stemming from a work-related incident. He received worker's compensation for the injury and was able to return to work. However, Plaintiff testified that he still had two hernias which caused pain in his stomach. Plaintiff stated that he was unable to return to work because he was unable to use his right hand. (Tr. 37-41)

On a typical day, Plaintiff woke up around 6:00 a.m., took his daughter to school at 8:00 a.m., and then took his medication. He was able to cook breakfast in the microwave. When Plaintiff returned home, he sat and watched TV. Plaintiff testified that his mind went crazy and he would start to think it was depression. He stated that his other two children lived with their mother and that she was concerned about Plaintiff's ability to hold it together. Plaintiff was undergoing treatment for the past six months and planned to continue the treatment. Plaintiff's physician told him that surgery messed up his right hand. Further, Plaintiff testified that he had

trouble concentrating and focusing due to pain and "other things." He thought about his dad all the time and went to counseling to deal with that issue. (Tr. 41-45)

The ALJ also questioned Plaintiff regarding his past employment and his impairments. Plaintiff stated that he was not prescribed physical therapy for his hand. His doctors had discussed a brace for Plaintiff's scoliosis. In addition, Plaintiff had a torn labrum in his left shoulder. Plaintiff was able to drive, but his license was suspended to do non-payment of child support. He stated, however, that the medication made him sleepy and unable to drive. The ALJ then requested that Plaintiff's attorney update the physical records. (Tr. 45-50)

A Vocational Expert ("VE") also testified at the hearing. The ALJ asked the VE to assume an individual of the same age, education, and work history as Plaintiff. The hypothetical individual could lift 10 pounds occasionally and less than 10 pounds frequently; sit and/or stand for six hours a day; occasionally climb ladders, ropes, and scaffolds; and occasionally reach overhead. Additionally, the person could not perform jobs requiring constant, rapid, repetitive use of the hands. The VE stated that the individual could not perform Plaintiff's past work. However, he could perform a variety of unskilled light and sedentary occupations. Examples included bakery conveyer worker, garment sorter, and office helper. (Tr. 50-52)

The ALJ then added the limitation of no more than occasional handing and fingering with the dominant right hand. Based on this hypothetical, the VE testified that the person could still work as a bakery conveyer worker. He could also work as an usher and counter clerk. There were a limited number of such jobs at the light level. At the sedentary level, the individual could work as a surveillance systems monitor and credit checker. (Tr. 52-53)

Plaintiff's counsel also questioned the VE. Counsel asked the VE to assume that the individual was expected to miss at least two days of work per month due to health reasons or

doctor appointments. Given this hypothetical, the VE stated that the person would be precluded from gainful work activity. (Tr. 54)

On February 7, 2013, Crystal Jackson completed a Function Report – Adult on behalf of Plaintiff. Plaintiff's daily activities included taking a shower to try to relax, and staying in the house. Plaintiff was depressed and hurting all day. He used a heating pad at night and worried about everything. He took care of his daughter and made sure she had food and a home. Plaintiff's fiancé helped Plaintiff care for his daughter. Plaintiff woke up with pain. He had difficulty taking care of his personal needs such as dressing and bathing. Plaintiff did not prepare meals; his fiancé performed the cooking. He was able to take out the trash. Plaintiff did not perform house or yard work due to pain in his arms and back. He only went outside during the summer. Plaintiff was able to drive, but he did not do any shopping. His hobbies included watching TV; listening to music; spending time with family; and playing guitar. Plaintiff reported, however, that he could no longer play his guitar. He did not spend time with others, and he had problems getting along with family, his mother in particular.

Plaintiff's conditions affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, use hands, and get along with others. He could only lift 10 pounds. He was unable to work with his hands, and he could stand no longer than 15 minutes. Plaintiff reported that he could walk a half block before needing to rest for 30-40 minutes. He did not know how long he could pay attention, but he was unable to finish what he started. Plaintiff did not know how well he followed written instructions. His ability to follow spoken instructions was fair. He got along with authority figures okay, but he was fired for running a form the wrong way. His ability to handle stress and changes in a routine was "not good." Plaintiff had a temper from not being able to handle stress

5

and from a fear of being unable to do things because he was broken down. Plaintiff wore a brace for his carpal tunnel syndrome. (Tr. 219-26)

Plaintiff also completed a Disability Report – Adult, listing his medical conditions as scoliosis, hernias, torn rotator cuff (left), depression, and both hands. He reported that he stopped working on January 21, 2013 because he had to take his fiancé to the doctor. Plaintiff further stated that he received treatment for depression in 2008. (Tr. 195-203)

## III. Medical Evidence

Between January 11, 2012 and February 1, 2013, Plaintiff saw Drs. Jimmy Bowen and James Edwards for complaints of arm and left shoulder pain. On February 1, 2013, Dr. Bowen noted that previous nerve conduction studies of Plaintiff's right upper extremity revealed ulnar neuropathy with abnormalities noted at the cubital tunnel and Guyon's canal with evidence of denervation. Physical exam revealed good flexion and extension of the elbow, good range of motion of his shoulder, and tingling and numbness down to his fingers with flexion. Dr. Bowen assessed right side ulnar neuropathy with denervation changes and continued pain and left shoulder pain. Dr. Bowen noted that an orthopedic surgeon opined that the left shoulder was not a problem. (Tr. 271-315)

While not part of the record, treatment notes from Dr. Bowen indicted that Dr. Mike Nogalski examined Plaintiff's shoulder as a possible worker's compensation case. Dr. Nogalski assessed a shoulder strain and recommended continued therapy. On March 21, 2012, Dr. Bowen assessed thoracic scoliosis with parascapular pain on the left side and left shoulder subacromial impingement. Dr. Bowen noted that the current examination was concerning for a labral tear or an anterior glenohumeral ligament injury. Dr. Bowen recommended continued physical therapy and prescribed Hydrocodone for pain. On May 18, 2012, Dr. Bowen noted that he disagreed

with Dr. Nogalski and assessed left shoulder subacromial impingement with the mechanism of injury consistent with a possible subscapularis tear or anterior inferior labral tear and anterior glenohumeral ligament injury. He recommended getting another opinion regarding Plaintiff's left shoulder. (Tr. 287, 291)

Plaintiff reported that his history of depression began in 1998. On July 23, 2013, he was admitted to the Poplar Bluff Regional Medical Center for psychiatric treatment after a suicide attempt by drug overdose. He was discharged on July 29, 2013 with diagnoses of status post intentional medication overdose; mood disorder, possibly due to general medical condition; rule out major depressive disorder; rule out adjustment disorder; and nicotine dependence. Plaintiff's Global Assessment of Functioning ("GAF") on admission was 20-25 and 55 upon discharge.[3] The discharging physician recommended that Plaintiff seek counseling at Bootheel Counseling Center. (Tr. 350-73, 380-81)

On August 30, 2013, Plaintiff began treatment with Dr. Sayeed, a psychiatrist with Bootheel Counseling Services. Plaintiff reported doing very well since leaving the hospital. He also reported financial and medical issues, along with anger problems. Dr. Sayeed diagnosed adjustment disorder with depressed mood; rule out major depression, recurrent; rule out bipolar disorder; and intermittent explosive disorder. Dr. Sayeed prescribed Seroquel, Prozac, and Trazadone and recommended that Plaintiff return in three to four weeks. (Tr. 355-57) While

___

[3] The Court notes that the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) was released in 2013 and replaced the DSM-IV. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki*, 2013 WL 3153981, at *1 n.2 (Vet. App. 2013) (quoting the DSM-V)).

difficult to read Dr. Sayeed's psychiatric progress notes, the notes primarily indicate adjustments to Plaintiff's medications. (Tr. 350-53, 380-81)

Plaintiff began treatment with Dr. Laurel Campbell on December 16, 2013. On that date she gave Plaintiff pre-operative clearance for carpal tunnel surgery. (Tr. 392-93) On December 26, 2013, Plaintiff underwent right cubital tunnel release surgery with subcutaneous transposition of the ulnar nerve and right carpal tunnel release surgery. Dr. Rudy R. Rodriguez reported no known complications. (Tr. 383-84)

Plaintiff returned to Dr. Campbell on January 30, 2014. Plaintiff reported neuropathy, weakness, numbness, and tingling in his right hand and arm, as well as pain in his right elbow. On February 20, 2014, Dr. Campbell assessed right upper extremity neuropathy, left shoulder labrum tear, anxiety/depression, and elevated blood sugar. She ordered a repeat nerve conduction study. On April 2, 2014, Plaintiff requested a refill of Oxycodone. Dr. Campbell noted weakness in the right hand, arm, and elbow. She assessed neuritis of the right upper limb and elbow pain. (Tr. 386-91)

Dr. Campbell completed a Residual Functional Capacity ("RFC") Questionnaire on January 31, 2014. Dr. Campbell listed Plaintiff's diagnoses as carpal tunnel, shoulder injury (labrum tear), anxiety, neuritis of the right elbow, and right elbow injury. While Dr. Campbell advised that an orthopedist would be a better judge, she estimated that Plaintiff's prognosis was fair. His grip strength on the right was 2/5. Dr. Campbell did not believe Plaintiff was a malingerer. She identified Plaintiff's symptoms as pain and weakness in the right elbow and decreased grip strength on the right with numbness and tingling. Dr. Campbell reported that Plaintiff's pain was 8/10 and was a sharp, stabbing, and burning pain in the right elbow with any movement or touch. Extension of the right arm caused a dull, pulling pain in the elbow that

8

radiated to the neck. Plaintiff experienced a dull ache while at rest on a daily basis. He could not extend his right elbow or grip with the right hand. His range of motion of the right arm was limited. Plaintiff experienced sensory loss in the right hand, tenderness in the right elbow, and muscle weakness in the right hand and arm. Dr. Campbell opined that emotional factors did not contribute to Plaintiff's symptoms and functional limitations. In addition, she believed Plaintiff's impairments were reasonably consistent with his symptoms and functional limitations. (Tr. 375-76)

Dr. Campbell reported that during a typical workday, Plaintiff's pain would frequently interfere with attention and concentration required to perform simple work tasks, with "frequently" defined as 34% to 66% of an 8-hour working day. Further, Plaintiff's medications of Oxycodone and Gabapentin caused impairment, drowsiness, and dizziness. His impairments lasted or could be expected to last at least 12 months. Dr. Campbell opined that Plaintiff could not walk any city blocks without severe pain; could sit 2 hours before needing to get up; and could stand 2 hours before needing to sit or walk around. During an 8-hour work day, Plaintiff could sit for 4 hours and stand/walk for 4 hours. Plaintiff required a job that included periods of walking around every 90 minutes for 5 minute periods. However, Dr. Campbell noted that Plaintiff's problems were in his arms, and in particular his elbows. Plaintiff did not require a job permitting shifting positions or taking unscheduled breaks. Because of Plaintiff's weakness in his dominant right arm/hand, Dr. Campbell opined that Plaintiff could rarely lift less than 10 pounds and never lift any heavier weight. He could occasionally twist, stoop, and climb stairs; rarely crouch/squat; and never climb ladders. Plaintiff had significant limitations with reaching, handling, or fingering. During an 8-hour working day, Plaintiff could use his right hand to grasp, turn, or twist objects and use his right arm to reach 0% of the time. He could use his right

9

fingers for fine manipulations 5% of the time. Dr. Campbell opined that Plaintiff's impairments produced "good days" and "bad days," resulting in more than four absences per month. Dr. Campbell concluded that Plaintiff's dominant right arm was weakened such that he would not be able to use his dominant hand. (Tr. 376-78)

## IV. The ALJ's Determination

In a decision dated May 15, 2014 the ALJ found that Plaintiff's met the insured status requirements of the Social Security Act through December 31, 2017. Plaintiff had not engaged in substantial gainful activity since January 21, 2013, the amended alleged onset date. The ALJ further found that Plaintiff had the severe impairment of bilateral carpal tunnel syndrome, status post December 2013 right carpal tunnel release. The ALJ determined that Plaintiff's scoliosis and left shoulder impairment were not severe because the record did not demonstrate that Plaintiff experienced any functional limitations in his ability to perform basic work activities due to those impairments. In addition, Plaintiff's depression was not severe because it did not meet the 12-month duration requirement. The ALJ further found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 11-14)

After carefully considering the entire record, the ALJ determined that Plaintiff had the RFC to perform light work with additional limitations. He could lift 10 pounds occasionally and less than 10 pounds frequently; was limited to no more than occasional reaching; could only occasionally climb ladders, ropes, or scaffolds; and could not perform work that involved constant rapid repetitive use of his hands. Although the Plaintiff was unable to perform any past relevant work, the ALJ found that, in light of Plaintiff's younger age, limited education, work experience, and RFC, Plaintiff could perform jobs that existed in significant numbers in the

national economy. Such jobs included bakery conveyer worker, garment sorter, and office helper. These jobs involved unskilled work generally performed at the light level. Thus, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from January 21, 2013 through the date of the decision. (Tr. 14-19)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the

initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id*.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[4] factors and whether the evidence so contradicts

---

[4] The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the

12

plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff argues that the ALJ's decision denying social security benefits was against the weight of the medical evidence. Specifically, Plaintiff asserts that the ALJ's finding that Plaintiff's right carpal tunnel release had resolved Plaintiff's right hand problems had no evidentiary support in the record. Further, Plaintiff claims that the ALJ had no basis for discounting or giving little weight to the opinion of Dr. Campbell. Additionally, Plaintiff contends that the ALJ's determination that Plaintiff's depression and torn left labrum were not severe impairments is not supported by the record. Finally, the Plaintiff argues that the evidence does not support the ALJ's finding that Plaintiff is capable of performing "light" work.

## A. ALJ's Finding of Non-Severe Impairments

Plaintiff claims that the ALJ erred in determining that Plaintiff's left shoulder pain and depression were not severe impairments. At step two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). See also 404 C.F.R. § 404.1520(c). Plaintiff has the burden of establishing that his impairment or combination of impairments is severe. *Kirby*, 500 F.3d at 707-08 (citations omitted). "Severity is not an onerous requirement for the claimant to meet, . . . , but it is also not

---

dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).

a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." *Id.* at 708 (internal citation and citations omitted). Under the regulations, an impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "An impairment or combination of impairments are not severe if they are so slight that it is unlikely that the claimant would be found disabled even if his age, education, and experience were taken into consideration." *Calhoun v. Astrue*, No. 1:10CV186MLM, 2012 WL 718622, at *9 (E.D. Mo. March 6, 2012) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)); *see also Kirby*, 500 F.3d at 707 ("An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.").

Here, the ALJ found that Plaintiff's left shoulder did not cause more than a minimal impact on his functional abilities during the relevant period. Indeed, the ALJ noted some decreased range of motion in February 2014 but found that Plaintiff had not demonstrated any physical limitations involving his left upper extremity since before his alleged onset date. (Tr. 13-14) The record shows that Plaintiff first complained of shoulder pain prior to his alleged onset date. However, he continued to work despite his shoulder condition. (Tr. 280, 299) The ALJ also noted that Plaintiff's condition had not worsened since his alleged onset date. Dr. Campbell stated in her 2014 questionnaire that Plaintiff had a past shoulder injury; however, she did not include his left shoulder or arm when assessing the severity of Plaintiff's pain or his functional limitations. (Tr. 17, 375-78) Evidence that Plaintiff worked with his alleged shoulder impairment, coupled with the absence of evidence showing significant deterioration, demonstrates that Plaintiff's condition was not disabling. *Goff v. Barnhart*, 421 F.3d 785, 792

14

(8th Cir. 2005) (citation omitted). Thus, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's shoulder condition was not severe. *Kirby*, 500 F.3d at 708.

Even if the ALJ should have found Plaintiff's shoulder impairment to be severe and, such error is harmless where, as here, the ALJ considered all impairments, both severe and non-severe, in the RFC assessment. *Harris v. Colvin*, No. 4:13-CV-02313-SPM, 2015 WL 756325, at *4 (E.D. Mo. Feb. 23, 2015). Plaintiff argues that the ALJ did not consider Plaintiff's shoulder pain or the medical records indicating pain. To the contrary, in determining Plaintiff's RFC, the ALJ did take into account Plaintiff's alleged shoulder pain by limiting the weight Plaintiff was able to lift to 10 pounds occasionally and less than 10 pounds frequently. The ALJ also limited Plaintiff to no more than occasional reaching, and only occasional climbing of ladders, ropes, or scaffolds. (Tr. 14) Thus, the Court concludes that the ALJ properly considered Plaintiff's shoulder injury in the RFC determination.

Likewise, the ALJ properly determined that Plaintiff's depression was not severe because it did not satisfy the duration requirement of 12 continuous months. "A severe impairment is one that significantly limits a claimant's physical or mental ability to perform basic work activities and has lasted or is expected to last for a continuous period of at least twelve months." *Darnel v. Colvin*, No. 2:13CV77 NAB, 2014 WL 5489290, at *3 (E.D. Mo. Oct. 30, 2014) (citing 20 C.F.R. §§ 404.1509, 416.909). Although Plaintiff contends that he had a history of depression, during the hearing, Plaintiff mentioned one episode in 2008 but acknowledged that he stopped treatment and medications, and he was able to work. (Tr. 36-37)

The record shows that Plaintiff did not report any mental impairment until his suicide attempt and hospitalization in July 2013, six months after the alleged onset of disability. (Tr. 360-73) While he received mental health treatment subsequent to his discharge, nothing in the

record shows any long-term mental health care. Additionally, the medical records indicate situational stress over unemployment, financial problems, and relationship problems with his mother. (Tr. 366) While Plaintiff's therapy sessions at Bootheel Counseling Services were brief and primarily consisted of medication adjustments, the medical records showed improvement with treatment.[5] (Tr. 380) Finally, in his Brief in Support of Complaint, Plaintiff addresses only the severity requirement, not the duration requirement. Plaintiff has the burden of demonstrating that he suffered from a severe impairment lasting the required twelve months. *See Karlix v. Barnhart*, 457 F.3d 742, 747 (8th Cir. 2006) (finding harmless error in determining plaintiff did not meet a listing where plaintiff failed to show he met the listing for the required twelve months). In short, the evidence in the record fails to demonstrate that Plaintiff's depression satisfied the durational requirement at step two of the sequential process. *See* 20 C.F.R. §§ 404.1509, 416.909.

## **B. Weight Given to Treating Physician Dr. Campbell**

Next, Plaintiff argues that the ALJ erred in giving little weight to the opinion of Dr. Laurel Campbell. Specifically, Plaintiff contends that Dr. Campbell's opinion and treatment records contradict the ALJ's finding that Plaintiff's right carpal tunnel release had resolved his

---

[5] Plaintiff contends that the GAF scores are determinative in this case. First, after Plaintiff was released from the hospital in July, 2013, Dr. Sayeed assessed GAF scores of 55-56, indicating only moderate symptoms. (Tr. 350, 352, 356); *see also Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*) 34 (4th ed. 2000) (A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning."). Second, the Social Security Agency has recognized, and the Eighth Circuit has noted, that GAF scores have limited importance. *Nowling v. Colvin*, 813 F.3d 1110, 1115 n.3 (8th Cir. 2016); *see also Jones v. Astrue*, 619 F.3d 963, 673-74 (8th Cir. 2010) ("'[T]he Commissioner has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the mental disorders listings.'") (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. App'x 411, 415 (6th Cir. 2006) (internal quotations and citations omitted)). The Court thus finds that the ALJ did not err in giving little weight to Plaintiff's GAF scores. *Nowling*, 813 F.3d at 1123.

16

right hand problems. The Defendant responds that the ALJ afforded proper weight to the medical opinions to the extent they were supported by the record as a whole.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

In this case, the ALJ properly found that the opinion offered by Dr. Campbell in her medical source statement was inconsistent with the medical evidence and with Dr. Campbell's own treatment notes. Therefore, the ALJ gave the opinions little weight. (Tr. 17) The ALJ noted that Dr. Campbell opined that Plaintiff had diminished grip strength, sensory loss, numbness, and weakness in his right hand. (Tr. 375-76) However, the record showed that about five months after carpal tunnel release surgery, the grip strength improved, although Plaintiff

17

reported he could not grip a wrench. (Tr. 386) Review of systems showed only some weakness in the right hand. (Tr. 386) Nothing in Dr. Campbell's treatment notes supports her opinion that Plaintiff was unable to use his dominant hand. Indeed, the record shows that Dr. Campbell primarily monitored Plaintiff's right arm pain and medications, and she mentioned no work restrictions or activity limitations after Plaintiff recovered from surgery. (Tr. 386-89); *see Choate v. Barnhart*, 457 F.3d 865, 870-71 (8th Cir. 2006) (finding that ALJ properly discredited physician's Medical Source Statement where treatment notes never mentioned restrictions or limitations to the plaintiff's activities).

As previously stated, the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz*, 182 F. App'x at 626. Further, because Dr. Campbell's questionnaire contained limitations far more severe than indicated in the treatment record and relied on subjective complaints, the ALJ properly gave the opinion little weight. *Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (discounting treating physicians' opinions where the form cited no clinical test results, treatment notes did not report significant limitations due to back pain, and the opinions were based on plaintiff's subjective complaints).

Plaintiff argues that if the ALJ wanted further explanation of the treatment records, he should have inquired of Dr. Campbell or a consulting physician. However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether Plaintiff is disabled." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011) (citation omitted). Here, the record contained thorough documentation of Plaintiff's exams with Dr. Campbell. *Id.* Therefore, the ALJ did not breach a duty to develop the record because the record contained sufficient evidence from which

to make an informed decision. *Ulrich v. Astrue*, No. 2:10CV89 JCH(LMB), 2011 WL 7401681, at \*13 (E.D. Mo. Dec. 2, 2011).

## C. The RFC Determination

Plaintiff also argues that the ALJ erred in finding Plaintiff capable of performing light work in the RFC determination. With regard to Plaintiff's residual functional capacity, "a disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 404.1545(a)(1).

The record shows that the ALJ properly considered the medical evidence and based the RFC determination on the evidence contained in the record. While Plaintiff exhibited some reduction in grip strength after his carpal tunnel release surgery, Plaintiff only showed weakness of digits 4-5 of the right hand five months later. (Tr. 387) He continued to have some elbow pain and neuritis of the right upper limb. (Tr. 386) The ALJ accounted for these impairments by limiting Plaintiff to light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567. The medical evidence does not demonstrate any limitations in Plaintiff's ability to walk, stand, or sit. Indeed, Dr. Campbell opined that Plaintiff's problems were in his

19

arms, and elbows in particular. (Tr. 377) In addition, the ALJ imposed further limitations of lifting no more than 10 pounds occasionally and less than 10 pounds frequently; no more than occasional reaching; no more than occasional climbing of ladders, ropes, or scaffolds; and no work that involves constant rapid repetitive use of his hands. (Tr. 14)

The Court finds that the ALJ's RFC determination is based upon substantial evidence. The ALJ accounted for Plaintiff's carpal tunnel syndrome, right arm problems, and left shoulder complaints by placing further restrictions on the use of his arms. These limitations are supported by the impairments and restrictions the ALJ found credible as stated above. In addition to the medical evidence, the ALJ noted that Plaintiff was able to work through his alleged onset date as a mechanic, which required heavy lifting; standing and walking; reaching; and handling or grasping objects. (Tr. 16) Further, Plaintiff reported that he stopped working for reasons other than his medical conditions. (Tr. 16, 196, 225) The ability to work with an alleged impairment and ceasing work for reasons other than disability reflect negatively on Plaintiff's credibility. *Goff*, 421 F.3d at 792-93. Thus, the Court finds that substantial evidence supports the ALJ's RFC determination. *Cypress v. Colvin*, 807 F.3d 948, 951 (8th Cir. 2015).

Plaintiff argues, however, that the hypothetical question posed to the VE failed to include all of Plaintiff's limitations, including absenteeism and side effects from medication. Therefore, Plaitniff asserts the VE's response did not constitute substantial evidence. The Defendant responds that hypothetical question properly included only those impairments and restrictions that the ALJ found credible.

The undersigned agrees that the ALJ posed a proper hypothetical question to the VE and that the VE's testimony that Plaintiff could perform work was substantial evidence in support of the ALJ's determination. "A hypothetical question is properly formulated if it sets forth

20

impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (quoting *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)). Further, where substantial evidence supports an ALJ's finding that a plaintiff's complaints were not credible, the ALJ may properly exclude those complaints from the hypothetical question. *Id.*

In the instant case, the ALJ included only those impairments and limitations that she found credible. The ALJ asked the VE to assume an individual limited to light exertional work with additional restrictions. These limitations are consistent with medical and other evidence in the record and with the ALJ's RFC determination. Therefore, the undersigned finds that "[t]he hypothetical was sufficient because it represented a valid assessment of [Plaintiff's] . . . limitations consistent with the evidence in the record." *Davis v. Apfel*, 239 F.3d at 966. Because the hypothetical question properly set forth Plaintiff's limitations, the VE's testimony constituted substantial evidence upon which the ALJ could properly rely in determining that Plaintiff was not disabled. *Id.* Therefore, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff had not been under a disability from January 21, 2013 through the date of the decision, and the Court affirms the decision of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum and Order.

Dated this 20th day of March, 2017.

_Ronnie L. White_

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**

21